We have a traffic light system. When the yellow light comes on during argument, you have two minutes left. When the red light comes on, we ask you to please conclude your argument unless you're answering a question from the court. We are familiar with the briefs and record excerpts. We have not necessarily read the record and appreciate citations to the 21-5085-50858. Right? We'll hear from Mr. Garnell. Okay. You're not in El Paso. Why do you need water here? My throat's dry enough. Living there long enough makes it that way. May it please the court, justices, and opposing counsel. In their live complaint, the plaintiffs pled that Officer Escajeda's unconstitutional acts proximately caused Daniel Ramirez's death. That's on record on appeal at page 37. They also alleged that his use of a taser was objectively unreasonable. That was on at page 23 of the record. Essentially, this matches up with the qualified immunity standard. As this court is well aware, qualified immunity standard, what must be proven is an injury, which resulted from the use of force that was clearly excessive, and the conduct of the officer was objectively unreasonable under clearly established cases. So they have essentially pled that qualified immunity does not apply. Under their pleading, the unconstitutional act was excessive force. The injury was the death of Daniel Ramirez, and that's on at page 37 of the record. And proximately caused means resulted, and the tasing was a clearly excessive act. Now, under a normal motion for summary judgment standard, a movement is entitled to summary judgment if the pleadings, discovery, disclosures, and affidavits show no genuine issue as to one of the material facts. But this isn't normal summary judgment standard. I mean, I appreciate that. We know that. My first question is jurisdiction. Yes, sir. Judge Guadarrama, I believe, found a genuine issue material fact as to causation. Correct. Okay. So this being an interlocutory appeal, if I'm not mistaken, why would we have jurisdiction to consider anything about that issue? And that's a causation issue, right? A battle of the experts kind of thing. Correct. And in Betz v. Brennan, the court specifically held that causation was in the qualified immunity standard. Causation is part of what comes up. Is that the tasing case with the guy on video? It is one of the tasing cases. I remember the facts more appropriately because they give a survey of all the tasing cases and what is and what isn't. I think I wrote that one, but I think that's the tasing case where it was on video. Yes, I believe that. So there was no disputed facts? No, but here I would argue there is no disputed facts. But Judge Guadarrama found there were disputed facts. Correct. So I don't understand how we would have jurisdiction to review issues of causation. I believe that would be similar to say if you have a qualified immunity case where a plaintiff pleads against many officers and just says that they caused an injury instead of the off-repeated standard of proving that each officer caused a constitutional injury to that specific plaintiff. If a district court said, well, there was an injury that occurred and these officers were there and therefore I denied qualified immunity at that time, then under that theory those officers could not appeal and say, look, I didn't cause that injury. Well, let me ask it this way. In your view, are you saying there are no disputed facts with respect to cause? I am, Your Honor. Okay. Why don't you explain that to me? Yes, sir. So what Judge Guadarrama relied upon was plaintiff's expert, Valentina Nye, who is a human dynamics expert. What is that? It is an expert in the field of human motion, objects in motion and how they move together and apart. Is that a medical specialty? It is not, Your Honor. Okay. And he specifically found when we filed our motion to exclude, when the defendants filed a joint motion to exclude her opinions, that she could not testify or opine as to cause of death. Sure. However, he said that she could testify that the forces that Officer Escajeda imposed on the plaintiff were the type that could cause the injuries to someone like Daniel Ramirez. Does the record reflect what were the injuries that caused the death? Yes. According to the medical examiner, the medical examiner says that the cause of death was suicide by hanging or hanging and that he specifically opined in his deposition that the tasing had no bearing on the decedent's death. Okay. So are you saying, as a point of error on appeal, there is no genuine issue of material fact as to what caused the death? Yes, sir. Okay. Thank you. And essentially, the analogy I came up with was if a judge suppresses evidence in a criminal case and then at the directed verdict stage says, well, that evidence that I suppressed, I'm going to use that now as evidence sufficient, a scintilla of evidence to get you past the directed verdict stage. That would be a problem. Going back to the earlier question, are you arguing that medical examiner's report is conclusive on the cause of death or said another way? I mean, it says what it says, Roth and the death certificate or whatever will say death is X secondary to Y and Z or whatever. I don't know what this one said. But part of the factual calculus seems to be, you know, he's hanging there and so on and so forth, like when did he die and, you know, was he alive at the point, you know, when he was tased and did he contribute to it and so forth, which I somewhat understood the district court to say, you know, all that's kind of a . . . it's sort of a combination of factors, quote-unquote, thus to be arguably a genuine issue of fact that's the cause of death. So I guess my question is, you seem to be saying what the medical examiner says is it, that a jury could not, you know, look at all these facts, how things happened, when he was, you know, hanging there, the tasing, et cetera, and couldn't conclude to the contrary? Based on the district court's opinion and order on the exclusion, the motion to exclude plaintiff's expert, he specifically found that the only person who could testify to a reasonable degree of medical probability as to the cause of death was the medical examiner. That's it. There is no expert who can testify to cause of death to a reasonable degree of medical probability. You know, the question whether he was dead or alive when tased goes to, I guess, the officer injured the fellow or caused . . . injured him and fatally injured him. But for the purposes of immunity, isn't the question whether the . . . no reasonable officer could have thought that the fellow in his position, which I gather was like this, with his hands . . . That's how we understood it, yes. That no reasonable officer could have perceived that he was a . . . posed a danger under the totality of the circumstances. Isn't that right? I think that's right. I think that goes to the second question, which is, was this reasonable under the clearly established case law? And I think even if for some reason this court were to find that we didn't have . . . meet our jurisdictional element on the first question, on the second question, I don't think there's any question but that we meet the never, ever argued at the district court below that he violated clearly established case law. They provided no case law. The district court, sua sponte, tried to, or put in his opinion, an order that Officer Escalera violated clearly established case law. Don't they say in their brief that you didn't contend that there was no clearly established law? They do say that, and I would argue that I don't have that burden. That is, the case law is very clear. Plaintiffs carry that burden, especially when they plead it. On the second prong question, are we required to view the facts in the light most favorable to the non-movement? In other words, if I'm trying to figure out if there's clearly established law that covers this or doesn't cover it, that's the question. I look at the record. I'm not quite sure what happened in those. It's a very short period of time, like 20, 30 seconds. Am I required to accept the facts that are most favorable to the non-movement, to the plaintiffs? The admissible facts, I would argue. If you have an opinion in the order that excludes certain opinions, then those opinions cannot be taken as fact. But otherwise, I think the facts that have developed on the record that are presumably admissible at trial . . . Let me just throw out a couple of facts. The lighting in the backyard, is it undisputed that the officer was unable to see what exactly the position of the hands were, whether the guy was hanging already or about to hang himself? What are the undisputed facts, as you understand it? As I understand it, since there's only one person who could testify as to what the lighting conditions were, Officer Eskew had to testify that he got there and couldn't see anything. He found it odd that when he showed up to the backyard, all of the lights in the house and out were off. It was completely dark. So in his mind, he felt like there was a possible ambush situation here because why would anyone call the police on a suicide in progress and then turn off all the lights? Right, but at some point, he walks in the backyard, I think, and he says he sees . . . He flashes his flashlight. He has his service revolver out, and he did this, but not really the record. He kind of crossed his hands, gun in one hand, flashlight in the other, and scanned the backyard and was able to see very quickly the decedent, what we now call the decedent, off in the distance, and approached him and was trying to give him commands. He could not determine whether he was alive or not in the dark, but was trying to give him commands to respond to the officer's authority. If he was alive, he's trying to make sure that they're both safe. If he's dead, well, I guess there's nothing that's going to happen, but at that point, he cannot determine. I think they did the officer say, I don't remember if it was a statement or a deposition, that he saw signs of life. He did see signs of life, and what he indicated were signs of life was that his hands were clenched and that he said the word, and I believe it was, hanging to his tiptoes or something to that effect, which the medical examiner opined really wasn't a sign of life. That was just a dead body in the medical examiner's opinion. Is there evidence in the record about what happens to people when they're hung? Yes. The medical examiner answered that question and said essentially that someone could look exactly like that. And so Officer Oscar Heather was faced with this situation of do I proceed? Do I drop my weapon and try and save this person? Do I use some level of force to try and get a person who may not be acquiescing to police authority? What do I do? I think this is exactly in line with this court's previous recent opinion in Ramirez v. Guadarrama where it says that although the employment of tasers led to a tragic outcome, and here we don't believe that the taser actually led to any outcome, we cannot suggest exactly what alternative course the defendant officers should have followed that would have led to an outcome free of potential tragedy. And they emphasize the reasonableness of a government official's use of force must be judged from the perspective of a reasonable official on the scene, not with the benefit of 20-20 hindsight. Here we're looking at it and saying what should he have done, but in the moment was there an alternative that would have led to something other than what occurred? In your view is the key fact here that it's dark, the officer doesn't really know what's going on and what to expect. I imagine if this is a situation in broad daylight and it's very clear what's happening, the guy's hanging himself, an officer responding by tasing him seems unreasonable, but that's not the facts here. That's not the facts here and that's probably unreasonable, although the Ramirez v. Guadarrama opinion… Well, yeah, but you know the big factual difference there. Right, there's notable… Doused himself in gasoline. Right, but then again, is tasing someone who's doused in gasoline a good idea? Well, but if he was doused in gasoline, he was about to light himself on fire and endanger the people around him. Right, there are factual differences certainly, but at what point does the officer say, heck with my personal safety, I'm going to go in without any protection? I mean I see your point when he arrives, it's completely dark, somebody's made the suicide call, he gets there and he says, and as Judge Duncan says, this all happens really, really quickly, but at some point, he's there, he's got the flashlight, but he clearly can see a person hanging. His hands are glass, he's there. Can't be much of a threat to the officer, you know what I mean, hanging there. So, you know, the tasing, is that an obvious, I know your answer, but I mean, you know, there are points you say, well, it's clear, established, unless there's a case, but if somebody's hanging there, his hands are glass, he's absolutely no threat, he sees some sense of life, but to tase some person, what, to take him on out? You know, to cause him to go ahead and die? I mean, it can't be for the purpose of preventing him from harming the officer, though I get it, and I'm not antithetic to the officer's plight showing up, don't get me wrong, I'm just trying to think through that. I mean, it is at night, but... May I respond? It's amazing, it remirrors something I was on the panel on that one, the house burn, so I remember that one all too well, and the facts are different, but yeah. So I think there's a couple of pieces to that question that need answered. Number one, you indicated your hand sort of above your head like this, that he was hanging on. In fact, his hands were alleged to be kind of around his neck, around the rope. Did the officer say that? That was what the officer said. And so we could not see his actual hands. He does not know what he's holding. If he comes in and, say, he could have a knife, a blade, there's a lot of things he could have in there. Holding his gun and his flashlight, so he didn't put the light there. I mean, I know we know beauty officers kind of go 20-20 hindsight. Right. They're all trying to get to the point of, you show up, you got the flashlight and the gun, you know, and I wasn't trying to mistake the facts as far as how his hands actually were. Right. But, I mean, he's got the flashlight and the weapon here, so presumably, just like he could see around, you know, he can see where his hands are. I mean, it's just probing the question. I mean, it's a difficult situation. But he can't see what's in his hands. He threw them five feet. I still don't think he can see what's in his hands. That was a friendly question. Oh, well, my apologies. Yeah, and I think the other— Five feet is not very far, and, you know, is he on tiptoes, right? That's what the officer says, and then, again, you don't know, is he on tiptoes or is tiptoes resting on the ground? Right. And then I think the question begs itself— No, he's not looking at the LED flashlight that's, you know, shining brightly around his neck, so, you know, an unfriendly question. Understood. But I also think that the injury that is alleged here is the death, and as cold and callous as it may be, if he was already hanging himself, and the evidence in the record says within a matter of seconds, he would have died from hanging. If he's already hanging, there is no injury at all. The officer, Escajeda, took him down and administered CPR, didn't he? Yes, ma'am. He did not even let a full cycle run through. All right. Well, you have time for rebuttal. Thank you. Mr. Benoit. Were your clients deposed? They were, Your Honor. I don't recall seeing anything in the briefs, at least, about your clients. That's a good point. I think part of the reason that they weren't— is the kind of procedural uniqueness of this case, which is that qualified immunity and the issue of threat was not really raised until a reply brief and a CSRS or a reply. And so the record did not, at that point, dealing with causation necessarily involve our clients' testimony. Well, there was nothing in there about why all the lights in the house were out? Not in the summary judgment record, Your Honor. But there is something in the record— I want to point to an issue that's been raised by everybody as to the lighting situation. At the moment that the taser was used, if you look to records 60-67 and 60-68, Officer Escajeda says himself that his flashlight, when he was five feet away, was bright and illuminating, and he very viscerally describes what he saw at that time. That was somebody who was staring, looking forward. In his deposition testimony, in his administrative statement, and in his supplemental, he states that he was standing on his tiptoes. And that his hands, in his supplemental statement, his hands were right and left hand clenched with tight fist to the part of the rope that was around his neck, squeezing tight. That level of detail, that's what he's able to see at the time he uses the taser. So that is all in the record. Your Honor, we ask the court to dismiss this case on the basis of jurisdiction or in the alternative affirm the district court's ruling for the following three reasons. First, the appellant did not invoke this court's jurisdiction over the question of whether there's a fact issue as to the element of causation. Second, if the court does consider causation, there is indeed a large fact issue, which I'll get into on the record. And third, the denial of Officer Escajeda's qualified immunity was proper under clearly established law. I want to turn to the issue of causation. This court's jurisdiction, as you know, is under the collateral order doctrine and limited to the qualified immunity defense. This court, in this case, in Ramirez v. Escajeda, stated that the qualified immunity defense is not a proper time . . . or I'm sorry, the denial of qualified immunity and an appeal on that is not the proper time to be addressing the fact issues as to the elements of the case. Well, of course, that was based on 12b-6. That has nothing to do with the present appeal where you've had opportunity for summary judgment on immunity. Well, I would argue that at 12b-6, the question was whether we had pleaded sufficient facts to support each element of the claim. At Rule 56 point, the question is whether we have a fact dispute as to each element of the claim. And I think it's completely analogous in that respect. But this court has never . . . there's no published qualified immunity decision in this circuit and in our review of other circuits in which causation was analyzed in either prong one or prong two of qualified immunity. And the reason for that is simple. In Tolan v. Cotton, Pearson v. Callahan, the court makes clear that the question for qualified immunity is whether the officer's conduct was unreasonable and, more importantly, whether the officer had fair notice on clearly established law that their conduct would be unreasonable. The question is not whether they had fair notice as to who their conduct might affect. And that's just a fact issue. That's a fact issue. You don't normally have a question in these cases about whether the tasing actually caused a person's death. Normally, you've got an arrestee and they tase the person. In several of our cases, our circumstances were the tasing was, according to our opinions, gratuitous. So gratuitously inflicted pain. Other cases, you have a shooting and it's obvious that the person was wounded or injured. So this is a little different. That said, Your Honor, we were not able to find . . . The only case where we found that the court addressed in the briefing the question of whether causation is subject to the qualified immunity defense was Hooks v. Brewer, which we cite in our briefing. Granted, it's unpublished and it's out of the Eleventh Circuit, but the court there says, and I think rightly so, that the question of causation is outside of the appellate court's grasp on a denial of qualification. We have . . . Well, I'm not sure that broad principle is really accurate, but besides that, what we have here . . . They say there's no genuine dispute, material dispute of fact, and we can grant summary judgment on that basis. So why don't you talk about . . . The only basis for the dispute here is this person, Ms. Nye, and her opinion about what happened, right? No, not at all, Your Honor. I disagree with that. There is a fact issue. Again, we point to four pieces of evidence in the record, and I'll go through each of them.  Two is the medical examiner's testimony, which includes in the deposition testimony information that is very important for a jury to understand. Three is the timeline evidence that's before the court. And then fourth, and not dispositively, is Dr. Nye's testimony after the exclusion as to how a taser will affect a body that's in this position, which will be permitted at trial. Officer Escajeda's testimony I mentioned a little at the beginning of my argument. He testifies that he sees these signs of life, and he describes them very closely. It's not just saying signs of life. He sees him standing, looking angrily forward, keeping the tension off the rope, and standing on his tiptoes on the ground. If you look to page 7624 of the record, there's a photo of the area where this happened. And you can see that somebody of Mr. Ramirez's stature, which is in the autopsy report, could easily be touching the ground as he's hanging. This is kind of a keeping the tension off the rope, second-thought situation, in the light most favorable to the plaintiff. When the taser hit, this changes completely. On 6120, he sees a tensing. On 6121, he hears a crunch, a grunt. At 6123 and 6071, and this is very important, there is a fact dispute as to whether the taser ran the course the full five-second course, and in fact, I would argue that there is not a fact dispute. Officer Escojeda stated that he did not hit the off switch on the taser and that that's the only way to turn the taser off. And the taser, everybody agrees, runs a five-second course of 50,000 volts through the body. After the taser hit, at the time the taser hit, he sees the fist squeezing harder. After the taser hit, he states, and this is Officer Escojeda's own words at 6072, when the two prongs hit the body, the body immediately became incapacitated. Those are his words. At 6124, now he's not breathing, a slight pulse. Two officers who arrived seconds later say that there's no pulse. Well, he couldn't see him breathing. There's no evidence about that, right? Well, but he described the other signs of life that occurred beforehand. But breathing was not one of them. No, Your Honor, that's not the record. If I understand the thrust of this argument, we're talking about causation. Yes. And what facts might suggest that the taser did cause death, right? Your primary argument, I think, is there's a fact dispute, genuine fact dispute, which I thought Judge Guadarrama found there was a genuine fact dispute. So we don't have jurisdiction to consider this issue. That's correct. That would be the second reason for no jurisdiction. Okay, so putting that to one side, I just want to understand, I understand this is not a jury, but if there were a genuine dispute of fact and this were a trial, what would be the theory of injury here? Since it seems undisputed that, unfortunately, that Mr. Ramirez was trying to hang himself, I guess, and the officer tasing him, what's the theory of injury if you were making an argument? Yes, Your Honor. And that actually goes to the medical examiner's testimony. It's proximate cause, so the question is not whether the diagnosis was death by hanging, which the medical examiner found, but whether the taser was a proximate cause to that death by hanging. In other words, it would have hastened the death? Correct, Your Honor. I think a good analogy to look at, maybe one I would make to a jury, is imagine somebody who's standing on the edge of a building about to commit suicide, and as they jump, they have second thoughts, and they're hanging from the edge of that building. If that person, if the first person to respond to that person wrapped their hands with a baton and they fell off, there would be no question that a proximate causation argument would still apply, even though, of course, the person could have maybe held there until they weren't able to hold on any longer and fallen off themselves. I think that's well with... Okay, but it is purely speculative that he was having second thoughts. The intent is something, obviously, we cannot put in the record, but the observations indicate somebody who was keeping the tension off the rope. A reasonable jury could find that based on the facts we have in the record. Or maybe he was trying to hold it, maybe it wasn't tight enough, and he was trying to make sure it got tighter. That could be all fact disputes for a jury to decide. I'm looking at the same photo you did. I see a rope that's been hooked to the basketball net and then wrapped around the post, and then it's hanging down. I assume it's hanging down somewhat. I mean, so there's a noose. But I get it. That's helpful, because I didn't understand the theory of injury. Yes, Your Honor. And I do want to point to Dr. Rasko and his testimony to the medical examiner. Of course, we've talked about what's in the autopsy report, but it's very important to look to what he said in his deposition. In the autopsy report, he stated that the taser was not thought to be a factor in the death. In his deposition, he said that was assuming, without any sort of citation to the record, that he was unconscious when he was tased. Well, if you look to the medical examiner's notes, they actually said that he was moving before he was tased. But what Dr. Rasko said at 60-60 and 60-61 in the record was if someone is conscious, you can make an argument that the taser played a role in the death. That's Dr. Rasko's own words. He goes on to say, when asked, if Ramirez was conscious at the time he was tased, then it could be a fact that the taser contributed to his death by hanging. And he answered positively to that. So he himself, the medical examiner, points us back to Officer Esquihela's testimony. What is the fact issue as to whether he's alive or dead when he's tased? And that's ultimately what a jury is going to have to decide. I don't want to tell you what to argue, but I do hope you get to the prong two point, the clearly established law point, and address where is it. This is, I think, admittedly, at least I think, it's a very unusual situation. And so when we have an unusual situation like this, we think, all right, well, what case placed the officer on notice that if you do this, you are violating the Constitution? Well, as to prong two, Your Honor, I think the decision that this Court made that you authored in Cloud versus Stone does an excellent job of summarizing this circuit's case. Mike, thank you. I appreciate it. I obviously wouldn't point to that case as a case that put him on notice because it happened afterwards and because it was a grant of qualified immunity. But I think the summaries of cases in that decision, all involved incidents that happened before 2015, or almost all of them at least. We have Newman versus Guidry and Remedios versus Martinez. And then on the non-taser cases, I think it's important to look to Hank versus Rogers, 853 F. 3rd, 738, which was addressed in Betts versus Brennan, which you also authored. And in those cases, we see kind of two sides. I think it was very well laid out. It's unreasonable to use a taser if somebody is not an immediate threat, which I'll get to in the fact record. If somebody is not resisting or passively resisting, in this case, not resisting, each of those cases involves some level of passive resistance. And if the officer immediately resorts to the use of it. It is not undisputed that he was incapable of resisting. The question for immunity is whether no reasonable officer could perceive that this fellow did not pose a risk under all the circumstances. That's right, Your Honor. And the most important thing is to look at the facts, not the subjective beliefs of Officer Esquiheda. At the moment, at the split second... Oh, I'm sorry, but Graham v. Connor depends very much on the beliefs. I mean, there's an objective test, but it depends very much on the perception of the officer as to what was going on. And whether that perception was objectively reasonable. Correct. Yes. But the facts at the moment that the taser happened, I want to point that out because that is the law of this circuit and the issue of the ambush, all of that, that the officer himself said in his deposition at page 61.12 and 61.13 that at the time he shot the taser five feet away, has a flashlight that's bright and illuminating, as he says in his supplemental report, he no longer... He knew that he was facing somebody hanging himself or trying to hang himself, and he no longer addresses this issue of ambush because he says no one's in the backyard. He acknowledged that. So at the time the taser was being used, the question is, what did he see? He saw everything I already described in terms of somebody who's doing this. He sees his hands. He sees there's a rope in his hands. That's in the record. He sees his hands around the rope, and he sees him standing on his tiptoes. At page 6300 to 6301, there's a deposition excerpt in which he says he saw no aggressive movement. His feet were on the ground. He was not kicking. So... You know, we have cases where a fellow has his back to the police. It is a dark room. The police are going in on a warrant. Here he's going in. I believe his testimony is that he was informed that it was an armed person. Your Honor, that is a fact issue. Well, he tested... He swore to that, and that's what it is, unless you have evidence to contradict that in the summary judgment record. We do, Your Honor. We have evidence to contradict that. Well, you can get to that in a second, but this is what I read, and I didn't read what you contradicted it with, which may be my error. But the point is, you know, the officer goes in. They find the suspect in a dark room. The suspect is getting up, turning around, and they shoot him dead, and under those circumstances, we have held that the officer is entitled to qualified immunity. Now, by your argument, we would have to do a point-by-point, each tenth of a second. Did he wait long enough? Was there, you know, did he see all his hands? How do we know that the man turning around doesn't pose a threat? And yet, because Graham B. Connors says, and Anderson B. Creighton, you have to consider the dangers inherent in policing. Right, and in those cases where the circuit is found similarly, the question was, at the split second, were there objectively reasonable facts that would lead somebody to believe they were faced with, in the case you cited, deadly force, and that was in the split second. It's not tenth of a second by tenth of a second. The question is, just at the use of force at that time, what were they facing? I guess I have two questions because I do want you to get to my first one and it had to do with Judge Jones' question about what in the record would contradict the officer's belief that this could be an armed suicide-by-cop situation. And my second one is, are you relying, I don't recall whether you cite our en banc decision in Colby-Carson, which, you know, which is a case that does involve an evident suicide. This one was gun not hanging. The officers were not granted qualified immunity. I dissented in the case, so it's not my favorite case, but it's a decision of our court. I'll answer the second question first. I am not relying on Colby-Carson. That case, like Betz v. Brennan and Claude v. Stone, involved much more of a lead-up to the use of excessive force that I think is relevant to the case lie discussed earlier. Here it's an almost immediate use of the taser, so no, I'm not relying on it, on top of the fact that it's a deadly force case. But with regards to the question of his belief that there was a weapon, he, the dispatch record, and I think it's very important to look to the dispatch record, that's at 60, 75, and 76. That's the event chronology. It's clear there were three mentions of what was happening at the incident that went out over dispatch. Somebody is, by tying a rope to a basketball court, that he has a rope in his hands. There's a suicide in progress. If you look to 66, 60, and 66, 57, two other officers' statements, they heard the same dispatch. None of them mentioned that they heard a weapon. And so there are facts in the record that his belief that he thought he heard a weapon, it is found nowhere in the evidence that anybody said that. And certainly there is a fact issue as to whether anybody else, there was no other officer that heard the same thing  And so that is, I mean, I think that's the definition of a fact issue that is basically a question of credibility for the jury to decide. The other issue that I think it's important to raise when it comes to the immediate threat question is that there's a fact issue as to whether the officer was alone or not, or at least whether he was the first officer to arrive. And this is something the district court got wrong, and we didn't include in the briefing, but it is in the record, and so I want to make sure that it's raised here. If you look to the event chronology and also to his administrative status... Before you run out, you better address the clearly established... I'm sorry? Before you run out of time, you better address the clearly established problem. Well, I was asked by... No, no, I'm sorry. Yeah, I think you should do that, since this last point you're making isn't raising the brief. I would like to hear what's the case. I think the case... What is your... If you had to point to one or two or three cases that really would have given the officer notice, don't do this, any officer. The cases are Newman v. Deidre, Ramirez v. Martinez, and Hank v. Rogers. I think those three cases provided a clear contour that you cannot resort immediately to serious nonlethal force when you're faced with somebody who does not oppose an immediate threat that is not resisting, in this case, in those cases, there was passive resistance, the officer's commands. And so I think those are the cases. For these reasons, Your Honors, we request that the court dismiss this case for lack of jurisdiction and may alternatively affirm the district court's ruling. Thank you. Thank you, sir. Mr. Garnell, rebuttal. I will take up plaintiff's arguments in the order I think they were presented. So the first one that I really want to deal with is that Dr. Raston's testimony is contradictory that somehow he created a fact question. And what he does is he's asked, essentially, a hypothetical in his deposition, and this is at 7660 to 7661. Plaintiff's counsel is asking him, you know, what is the basis of your opinion that the Taser did not contribute to his death by hanging? My opinion is that he probably was already in cardiac arrest by the time or unconscious. He already was unconscious by the time the Taser, you know, exerted its action on him and thus did not really make a difference in the outcome. You can lose consciousness in a matter of seconds after you hang, and the loss of movement or muscle tone will follow very shortly thereafter. The question was asked, what is the basis of your understanding that Mr. Ramirez was unconscious at the time he was tased? The basis of my understanding is that you answer my question, but I'm asking you to try to answer my question. Describe what an unconscious person, how would they appear? So they get into a back and forth, and Dr. Raston essentially comes down to the answer. The question is, let's suppose he was conscious. So there's really not a fact there. That's a supposition, a hypothetical of, let's suppose he's conscious because that works my theory of the case versus what you have concluded. So that was not really a fact issue that Dr. Raston created. That was a hypothetical question. I also want to look at, you know, whether causation, again, is an element of what is proper for jurisdiction on appeal. This court's opinion in Rockwell, and I put this in my brief because it laid out in steps. It laid out, like, the three prongs. Plaintiff's must show an injury. That's prong one. Two, which resulted from the use of force that was clearly excessive. So prong two has essentially, like, two mini prongs to it, and then three is the excessiveness of which was objectively unreasonable. So Rockwell puts into, clearly delineates, that causation is something for this court to consider. That is part of the qualified immunity analysis. I really don't doubt that, to be frank. What my concern is is that there is a fact issue as to causation, and so we lack jurisdiction to reach the issue. I mean, that's as simple as that. Understood. And that's kind of taking it step by step. I think I read plaintiff's brief to be number one, that causation is never a fact issue, and I think they argue that at the district court below. Causation is never an appellate issue. And then once we're here, they say, well, it's two prongs. It should never be considered here, and even if it is, there's a fact issue. And obviously the argument is that the fact issue is not a fact issue because you have an officer who's essentially a layman trying to describe what could or could not be medical diagnoses or medical positions, and then you have the stricken testimony of an expert who is not a medical expert. Then you've got this issue of whether or not Officer Eska Hedak . . . the reasonableness of his actions and whether he was the only person there. There is no testimony in the record that there was somebody with him. Okay. Well, I understood that point not to have been raised in the brief. Do you dispute what counsel said? You argue that there's evidence in the record that creates a fact dispute as to whether the dispatch record announced, hey, there's a weapon here. There's a possible weapon. I hate to step on my own feet, but plaintiff's counsel was right there. I think Officer Eska Hedak in his own deposition agreed, I don't hear it now. Right about what? Right about the fact that his hearing of believing that this person was armed was an error. I think his deposition testimony, in fact, confirms that was not in the dispatch. But what I think we're doing in the most clear sense of the word is looking at his actions from a 20-20 hindsight. Well, no. I mean, if there's a jury could find, no, it was an unreasonable belief that there was a weapon there. Right? Nobody told him that. But a mistake as to what is going on, an accident as to what is going on, what he believes in the seconds that he's dealing with, I think does matter. And I think it also goes to we're second-guessing him at that point. Is the 9-1-1 call in the record? I don't believe it is, but I believe the dispatch report is. I don't recall the 9-1-1. It would be some written summary. Yes, ma'am. Okay. Yes, ma'am. Well, this is—your time has elapsed. Yes, ma'am. Thank you. Okay. Thank you.